UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 03-CR-10353-WGY |
| | ) | |
| ROMAN VALDMA, | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, Roman Valdma ("Valdma"), submits this memorandum in support of his request for a sentence of 36 months and a recommendation for placement in the Bureau of Prisons' Intensive Confinement Center ("ICC") Program.

### ARGUMENT

**A. Sentence of 36 months**

On August 3, 2004, Valdma entered a plea of guilty on all counts of a 20-Count Superseding Information. Valdma's adjusted offense level is 20. Having no prior convictions, Valdma is in Criminal History Category I. Because of a statutory mandatory minimum in this case, Valdma's applicable sentencing range is 36 to 41 months. Based on Valdma's offense conduct and prolonged period of home confinement, Valdma seeks a sentence of 36 months.

**1. Offense Conduct**

Valdma's offense conduct does not warrant a sentence above the statutory mandatory minimum of 36 months. The only irrefutable evidence regarding Valdma's

offense conduct comes from the recorded conversations between Valdma and Female 6.[1]

Relevant portions of the transcript of these conversations are attached hereto at Exhibit A.

Female 6 was a confidential informant who, with the aid of Estonian law enforcement,

recorded conversations she had with Valdma and Valdma's agent while in Estonia.

Those conversations offer the truest account of the manner in which Valdma recruited

women to work in his erotic massage business. The conversations are the most reliable

indicator of Valdma's relevant conduct. In sum, the conversations reveal that Valdma

told Female 6 that: (1) the massages were erotic in nature;[2] (2) Valdma expected to be

reimbursed for the cost of the round trip plane ticket he purchased for Female 6; and (3)

performing erotic massages was strictly voluntary.

### Nature of the Massage

During his plea on August 3, 2004, Valdma admitted that he was intentionally

vague with some of the women with respect to the erotic nature of the massages. But

Valdma was clear with others, as reflected in Valdma's conversations with Female 6.

At no point was Female 6 misled about the nature of the massages. During an

initial conversation on February 25, 2003, Valdma's agent revealed to Female 6 the exact

extent of the massage, explaining that "it is erotic massage, it is not the regular massage.

Regular massage will not get you many clients. There is nothing special about it." Ex. A

at 5. On April 2, 2003, Valdma also explained the nature of the massages to Female 6.

Ex. A at 16-17. Valdma even told Female 6 that she was free to tell her Estonian friends

that she would be performing erotic massages. Ex. A at 17. In short, there is nothing in

---

[1] The women are identified in the Information as Females 1 – 7.

[2] The term "erotic" as used herein refers to the manual masturbation of a customer at the conclusion of a massage.

the recorded conversations to suggest that Valdma was anything by forthright with

Female 6.

### Repaying Cost of Ticket and Visa

The government alleges that "most of the women" did not know that they would

be required to repay Valdma for the cost of airline tickets he purchased for their travel to

Boston. The government suggests that the women felt they had no other recourse but to

work for Valdma to pay for their return ticket. The recorded conversations with Female

6, however, show that Valdma was clear that he expected to be reimbursed for the airline

ticket from the outset.

Both Valdma and his agent informed Female 6 that she would have to repay

Valdma for travel expenses and visas. Ex. A at 4, 13, 17. Valdma even estimated for

Female 6 that it would take about a week of performing erotic massages to repay him.

Ex. A at 17. Like the erotic nature of the massages, there is nothing to suggest that

Valdma misled Female 6 about his expectation for reimbursement for airline tickets.

### Voluntary Nature of the Massages

The government also alleges that Valdma used threats to compel the women to

perform erotic massages. However, the recorded conversations with Female 6 and the

actions of three other women suggest that they performed the massages willingly as a

way to come to America to earn money.

Valdma was clear with Female 6 that she could work as much or as little as she

wished. Valdma's agent explained to Female 6 that she could make a lot of money if she

was willing to work hard. Ex. A at 5. Valdma's associate explained that if Female 6

wanted only to work a little, "no one will tell you 'no.' Roman is not that kind of guy."

Ex. A at 5.  Valdma later emphasized to Female 6, "It is not slavery here!  You do as much [work] as you feel like."  Ex. A at 16.

In addition, three of the women, Female 1, Female 5, and Female 7, voluntarily returned to perform erotic massages after having left; actions that belie allegations the women were forced to perform massages.

Female 1 first worked for Valdma in 1999 and stopped around Christmas of that year when she got married.  About two-and-a-half years after later, Female 1 voluntarily returned to perform erotic massages.

After performing two erotic massages in Boston, Female 5 returned to New York. About two weeks later, Female 5 asked Valdma if she could return to Boston to perform erotic massages because she wanted to make money.  Female 5 eventually recruited her friend, Female 7.

After performing about four massages over the course of two days, Female 7 returned to Miami.  About a week later, Female 7 returned to Boston to perform erotic massages, motivated by the opportunity to make money.  According to Female 7's grand jury testimony, when she informed Valdma that she may only stay a month, Valdma told her to return for as long as she wanted.

In sum, Valdma's offense conduct was not so aggravating as to warrant a sentence above the statutory mandatory minimum.  The Court should impose a sentence of 36 months in this case.

### 2.  Prolonged Period of Home Confinement

The Court should also consider Valdma's prolonged period of home confinement when imposing Valdma's sentence.  A defendant cannot receive credit toward his

sentence for time spent in home confinement, <u>Reno v. Koray</u>, 515 U.S. 50, 54 (1995).

However, a Court may consider time spent in home confinement when deciding where

within the applicable guideline range to sentence a defendant. <u>United States v. Zackular</u>,

945 F.2d 423, 426, n.4 (1st Cir. 1991).

On December 30, 2003, Valdma was ordered confined to his home by electronic

monitoring as part of his pretrial conditions of release. The conditions allowed for

Valdma to leave his home for court visits, attorney visits, medical needs, church services,

and two hours a week for errands. On August 3, 2004, Valdma pled guilty to a 20-count

superseding information. By the time Valdma is sentenced on November 23, 2004, he

will have spent almost 11 months in home confinement. While home confinement is not

considered "official detention," Valdma's freedom of movement has been restricted

considerably for an extended period of time. As such, Valdma is requesting that the Court

consider his presentence home confinement and impose a sentence of 36 months.

**B. Intensive Confinement Center Program**

Pursuant to U.S.S.G. § 5F1.7, Valdma requests that the Court recommend him for

participation in the Bureau of Prisons' ICC Program. The ICC Program, which is also

referred to as shock incarceration or boot camp, is authorized by 18 U.S.C. § 4046. The

ICC Program is a voluntary program that combines strict discipline and job training. An

inmate who successfully completes the six-month program is eligible to serve the

remainder of his sentence in a community corrections center and home confinement.

The difference between straight incarceration and the community-based programs

available to ICC Program graduates is significant. During the six-month program, the

inmate is taught the discipline and life-coping skills necessary for a successful

reintegration into society; skills that the inmate will not attain in a traditional prison setting. Upon successful completion of the ICC Program, the inmate is given the opportunity to begin a gradual reintegration into society through placement in a community confinement center and, later, home confinement. The benefits of the ICC Program for someone with a low recidivism rate cannot be overstated.

The program is available to an inmate serving a sentence between 30 to 60 months who meets the specified criteria for eligibility.[3] Although the Bureau of Prisons will ultimately decide who is designated to the ICC Program, a judicial recommendation is given great weight. Indeed, it is the policy of the Bureau of Prisons to contact the sentencing judge where an otherwise eligible inmate did not obtain a judicial recommendation at sentencing. Federal Bureau of Prisons, U.S. Department of Justice, Program Statement No. 5390.08 at 6 (Nov. 4, 1999).

---

[3] The criteria for eligibility is outlined in 28 CFR § 524.31 as follows:

(a) Eligibility for consideration of placement in the intensive confinement center program requires that the inmate is:
(1)(i) Serving a sentence of more than 12, but not more than 30 months (see 18 U.S.C. 4046), or
(ii) Serving a sentence of more than 30, but not more than 60 months, and is within 24 months of a projected release date.
(2) Serving his or her first period of incarceration or has a minor history of prior incarcerations;
(3) Is not serving a term of imprisonment for a crime of violence or a felony offense:
(i) That has as an element, the actual, attempted, or threatened use of physical force against the person or property of another, or
(ii) That involved the carrying, possession, or use of a firearm or other dangerous weapon or explosives (including any explosive material or explosive device), or
(iii) That by its nature or conduct, presents a serious potential risk of physical force against the person or property of another, or
(iv) That by its nature or conduct involves sexual abuse offenses committed upon children.
(4) Appropriate for housing in minimum security;
(5) Physically and mentally capable of participating in the program;
(6) A volunteer.

(b) Placement in the intensive confinement center program is to be made by Bureau staff in accordance with sound correctional judgment and the availability of Bureau resources.

28 CFR 524.31

Under the criteria specified by the Bureau of Prisons, Valdma is a prime candidate for participation in the ICC Program.  In addition to meeting the objective criteria for the program, Valdma should be considered for the ICC program for subjective reasons. There is nothing to suggest that Valdma presents a high risk of recidivism.  There is every reason to believe that Valdma, who at 38 has never before been convicted of a crime, can be rehabilitated.  The ICC Program will provide Valdma with the opportunity to begin transitioning back into the community and becoming a functioning member of society.

## **CONCLUSION**

For the foregoing reasons, Valdma requests that the Court impose a sentence of 36 months along with a judicial recommendation to the Bureau of Prisons' ICC Program.

ROMAN VALDMA
By his attorneys


  /s/ Matthew D. Thompson
Thomas J. Butters
B.B.O. No. 068260
Matthew D. Thompson
B.B.O. No. 655225
Butters, Brazilian & Small LLP
One Exeter Plaza
Boston, Massachusetts 02116
617-367-2600

Dated: November 19, 2004